MKD:kap 37166 \\psenting\371664.ffidavitDanaHewins.wpd

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MASSACHUSETTS

CAROLINE DACOSTA, as Personal
Representative and Administratrix for the
Estate of JOSE L. DACOSTA, JR.

VS.                                               C.A. NO. 04CV12059 JLT

CPR FISHING, INC.


PEARL BEAUVAIS, as Personal
Representative and Administratrix for the
Estate of JOHN BEAUVAIS

VS.                                               C.A. NO. 04-12057 NG

CPR FISHING, INC.

### AFFIDAVIT OF DANA C. HEWINS, Ph.D.

I, Dana C. Hewins, under the pains and penalties of perjury, hereby make affidavit as follows:

1. I have been retained by the defendant in the above entitled action to provide an opinion as to the probable net lost future earnings of Jose L. DaCosta, decedent in the above-entitled action. My findings are substantially contained in the attached report.

2. My qualifications are substantially reflected in my curriculum vitae attached.

3. My analysis employed the standard methodology used by economists to determine the present values of future economic losses, and was based on data from both private and public sources, including the vocational assessment prepared by Amy Vercillo of Rehabilitation and Reemployment, Inc.

4. The decedent was born on August 23, 1978, and attended school to the tenth grade. He was survived by two (2) sons, Tyler, born March 12, 1998 and Matthew, born December 12, 2003.

5. In order to determine the net lost future earnings I first calculated the present value of Mr.

-1-

10/28/2005 12:30 5089475151 BRAHERTNS PAGE 03
10/26/2005 19:52 GLENN & PENZA → 15089475151 NO.837 P03

personal consumption. This is the proper measure of the present value of the net economic loss to his survivors.

6. The present value of his net economic loss was calculated by discounting all relevant dollar amounts by the appropriate interest rate. The taxable discount rate used was 2.5%, approximately equal to the average annual "real" (i.e., inflation - adjusted) yield on three (3) year government securities for the past thirty (30) years. Using the "real" discount rate in tandem with real earnings growth rates eliminates the need to forecast inflation rates and the standard methodology employed by economists to determine the present values of future economic losses.

7. I next determined the decedent's probable work life expectancy. Using the methodology employed by the Department of Labor to compute work life expectancies, based on 1996-1998 labor force data, the work life expectancy of a currently-active white male age 25 years, who completed less than 12 years of education, is 29.1 years.

8. Based on the report of Amy Vercillo, the decedent could not likely have sustained a physically - demanding career as a commercial fisherman. Ms. Vercillo has opined, that because of his physical limitations and lack of transferable skills, the decedent's best case scenario would have been to earn an amount comparable for men of his age and education, or $16,128 per year, measured in 2002 dollars. To allow for wage increases in 2002 and 2003, this total was rounded to $17,000. In order to determine personal consumption figures, the annual income of Kathy Coe, $13,000 per year, was taken into account.

9. When calculating the future lost earnings of a 25-year-old male, understanding the dynamics of wage increases is important. Earnings tend to increase relatively rapidly in the early years of one's career as a result of experience, seniority, promotions, merit increases, job changes, etc., and then more gradually in the latter stages. This is reflected in the U. S. Department of Commerce's current population survey. The overall earnings for workers as a whole tend to rise over time as the productivity of the labor force in general increases. Overall earnings of workers also tend to increase over time to compensate for inflation. This analysis was done in real terms, taking into account only the life cycle and productivity factors described above. Based on the U. S. Department of Commerce's current population survey with men 9 - 12 years of education, without a high school diploma, it was assumed that the decedent's earnings would have increased in the future, had he lived, at the average annual real rate of 2% until age 45, and 1% thereafter. From the date of his death, September 8, 2003, Mr. DaCosta's 29.1 year statistically expected work life, using the $17,000 annual rate of pay in 2003, increased over time at the average real annual rate of 2% until age 45 and 1% thereafter, employing a real discount rate of 2.5%, the present value of Mr. DaCosta's lost future earnings was determined to be $466,000 as of December 6, 2004.

10. Mr. DaCosta's personal consumption expenditures must be subtracted from the lost earnings in order to determine the net economic loss to his survivors. Mr. DaCosta's lost future income

-2-

10/28/2005 12:38  5089475151  DANA HEWINS  PAGE 04
10/28/2005 13:53  GLENN & PENCE → 15089475151  NO.837  P04

was reduced by 30% for his younger son until his 18th birthday in the year 2021 and 40% thereafter. These consumption expenditures are based on the U. S. Department of Labor Consumer Expenditure Survey. Applying the consumption percentages to Mr. DaCosta's projected earnings yielded present value of probable lost earnings, net of personal consumption, equal to $310,319 as of December 6, 2004.

11. Two competing future considerations should also be addressed. For the period that the decedent would have continued to work as a fisherman/scalloper, the decedent probably would have earned income higher than the average for men of his age and education. This implies that the above figures understate the economic loss to the decedent's survivors. Secondly, the economic evaluations above assumed that Mr. DaCosta would have an average work life expectancy. Given information provided by the U. S. Department of Commerce, as well as articles and studies published in the Journal of Rheumatology, including those by W. F. Hawley (1998), T. Sokka (1998), E. M. Barrett (2000), it is highly probable that the decedent's ability to work in the future, in any capacity, would probably have been seriously adversely affected by his arthritis. This consideration implies that the above economic loss figures may be overstated.

12. It is not possible to predict which of these two (2) offsetting considerations would have been more likely. The above economic loss evaluation, which assumes earnings equals to the average for men of Mr. DaCosta's age and education, and normal work life expectancy represents, on balance, a reasonable estimate of the economic loss to his survivors.

_Dana C. Hewins_
DANA C. HEWINS

COMMONWEALTH OF MASSACHUSETTS
COUNTY OF _Plymouth_

On this _28th_ day of _Oct_____, 2005, before me personally appeared _Dana C. Hewins_ to me known to be the person described in, and who executed the foregoing instrument, and he/she acknowledged that he/she executed the same.

_Sandra J. Horton_
NOTARY PUBLIC
My commission expires: _2/2/07_

-3-

SANDRA J. HORTON
Notary Public
Commonwealth of Massachusetts
My Commission Expires Feb 2, 2007

## CERTIFICATION

I certify that I sent a true copy of the within on *October 28, 2005* to:

Thomas J. Hunt, Esq.
THOMAS J. HUNT AND ASSOCIATES
18 North Water Street
New Bedford, MA 02740

*/s/ Kendra Pascucci*

# Dana C. Hewins, Ph.D.
*Economic Consultant*
1 Tamett Brook Road
Lakeville, Massachusetts 02347
508-946-1116   Fax: 508-947-5151

## QUALIFICATIONS

Dr. Dana C. Hewins is an economist who has had thirty years of academic and consulting experience. Educated in economics at Tufts University (Bachelor of Arts), the University of Chicago (CIC Traveling Scholar), the University of Illinois (Master of Arts, Doctor of Philosophy in Economics), and Harvard University (postdoctoral study), Dr. Hewins specializes in the areas of labor economics, health care economics, and forensic economics.

Dr. Hewins taught at Ohio University from 1973 to 1982. In 1981, he was named University Professor by Ohio University, the highest honor bestowed by that university for excellence in teaching. After serving as a visiting professor at Tufts University in 1983, he joined the staff of Regis College where he served as Chairman of the Department of Economics for many years prior to his decision to opt for early retirement in the Spring of 2002.

Since 1983, Dr. Hewins has provided economic analyses in a wide variety of legal proceedings. These proceedings have included personal injury, wrongful death, wrongful termination, lost profits, malpractice, divorce, discrimination, and antitrust actions. He has served both plaintiffs and defendants, and has testified in state and federal courts throughout Massachusetts.

Dr. Hewins has also served as an economic consultant to many organizations and institutions, including the Ohio Supreme Court, the Appalachian Regional Commission, and the Area Six Health Systems Agency. His research on a variety of topics has been published in periodicals such as the *American Bar Association Journal, Economic Inquiry, the Review of Social Economy, the I.C.C. Practitioner's Journal,* the *Quarterly Review of Economics and Business,* and the *Massachusetts Lawyer's Weekly.* He is a trustee and past Chairman of the Board of the Bridgewater Savings Bank, and a member of the American Economic Association, the American Academy of Economic and Financial Experts, and the National Association of Forensic Economics.

--VITA--

Dana C. Hewins, Ph.D.                                Telephone: 508-946-1116
1 Tarnett Brook Road
Lakeville, Massachusetts 02347

## EDUCATION

B.A. in Economics, Tufts University, 1968
M.A. in Economics, University of Illinois, 1970
CIC Traveling Scholar, University of Chicago, 1970-71
Ph.D. in Economics, University of Illinois, 1975
Postdoctoral study, Harvard University, 1982-84

## ACADEMIC EXPERIENCE

University of Illinois, 1972-73
Ohio University, 1973-82
Tufts University, 1982-83
Regis College, 1984 to 2002

## OTHER PROFESSIONAL EXPERIENCE

Research Assistant and Staff Writer, Bureau of Economic and Business Research, University of Illinois, 1969 to 1973

Member of the Board of Directors of the federal Area Six Health Systems Agency, 1977 to 1980

Vice President and Senior Economist, Commonwealth Research Group, Boston, Massachusetts, 1983 to 1990

Trustee and past Chairman of the Board of the Bridgewater Savings Bank, 1987 to present

## SELECTED PROFESSIONAL ACTIVITIES

Deputy Director of a project which resulted in the publication of the first
    comprehensive economic abstract for the state of Illinois,
    1971 to 1974

Member of a research team selected by the Appalachian Regional Commission to
    evaluate the costs and benefits of emergency medical services in rural areas,
    1975 to 1977

Member of a task force appointed by the Ohio Supreme Court to assess the
    efficiency of Ohio's municipal court system, 1977 to 1979

Member of a research team selected by the Ohio Nursing Home Association to
    evaluate the econometric methodology employed by the state of Ohio to set
    prospective reimbursement rates for Ohio nursing homes, 1979 to 1980

Member of a research team which performed a quantitative evaluation of the
    relationship between the usage of radar detectors and automobile accident
    rates, 1987 to 1988

Member of a research team chosen by the United States Air Force to determine
    which weapon systems should be funded on a multi-year procurement basis,
    1988 to 1989

Author of articles, reviews, and comments on a variety of topics which have been
    published in periodicals such as the *American Bar Association Journal*,
    *Economic Inquiry*, the *Review of Social Economy*, the *I.C.C. Practitioner's
    Journal*, the *Quarterly Review of Economics and Business*, and the
    *Massachusetts Lawyer's Weekly*

Member of the American Economic Association and the National Association of
    Forensic Economics

## HONORS AND AWARDS

Designated Uniroyal Scholar at Tufts University, 1967 to 1968

Named CIC Traveling Scholar, University of Chicago, 1970 to 1971

Awarded honorary title of University Professor by Ohio University in 1981

# Dana C. Hewins, Ph.D.
*Economic Consultant*
1 Tamett Brook Road
Lakeville, Massachusetts 02347
508-946-1116   Fax: 508-947-5151

## APPEARANCES AT DEPOSITION, 1999-2003

| ATTORNEY | CLIENT | LOCATION | MONTH/YEAR |
|---|---|---|---|
| William Wheatley | Muriel Rogers | S. Easton | 11/99 |
| Robert Friedman | Celia Zimmerman | Boston | 1/00 |
| James Brett | William Pitts | Boston | 5/00 |
| Jodi Petrucelli | Laurence Murray | Boston | 6/00 |
| Michael Paris | Brian Higgins | Boston | 7/00 |
| Paul Driscoll | Peter Burnham | Marshfield | 8/00 |
| Lewis Eisenberg | Scott Steeves | Boston | 12/00 |
| Michael Lynn | Leo Cormier | Boston | 12/01 |
| John LeGrand | Greg Martin | Somerville | 3/02 |
| Henry Owens, III | Joseph Simon | Boston | 5/02 |
| David Kaplan | Philip Ashworth | Boston | 1/03 |
| Gerard Mahaney | Kevin Johnson | Natick | 1/03 |
| David Anderson | Steven Reeves | Boston | 6/03 |
| Maureen Counihan | Philip Pallone | Wellesley | 11/03 |
| Garry Lane | Sherry Tasker | Boston | 12/03 |

# Dana C. Hewins, Ph.D.
*Economic Consultant*
1 Tamett Brook Road
Lakeville, Massachusetts 02347
508-946-1116   Fax: 508-947-5151

## APPEARANCES AT TRIAL, 1999-2003

| ATTORNEY | CLIENT | COURT | MONTH/YEAR |
|---|---|---|---|
| David Dwork | Jessica Mccarthy | MA Superior (Cambridge) | 12/99 |
| Carolyn Latti | Joaquim Matos | Federal (Boston) | 12/99 |
| Robert Friedman | Celia Zimmerman | Federal (Boston) | 2/00 |
| Louis Movitz | Kenneth Tikasingh | MA Superior (Boston) | 4/00 |
| Edward Denn | William Joubert | Federal (Boston) | 4/00 |
| William Green | Albert Knotts | MA Superior (Boston) | 4/00 |
| Robert Byrne | Christopher Morano | MA Superior (Boston) | 5/00 |
| David White-Lief | Samantha Mosher | MA Superior (Cambridge) | 6/00 |
| Michael Underhill | Kenneth Cummings | RI Superior (Providence) | 7/00 |
| Michael Paris | Brian Higgins | MA Superior (Cambridge) | 9/00 |
| Susan Mooney | Judith Hickey | MA Superior (Lawrence) | 11/00 |
| Kevin Phelan | Barbara Hunsinger | MA District (Fall River) | 11/00 |
| James Rudser | Jamie Comerford | MA Superior (Lawrence) | 12/00 |
| Carolyn Latti | Carlos Castro | Federal (Boston) | 3/01 |
| Abigail Williams | David Oliver | MA Superior (Worcester) | 4/01 |
| David Berg | David Kenny | Federal (Boston) | 4/01 |
| Karen Ristuben | Michael Cardarelli | MA Superior (Boston) | 4/01 |
| Barry Reed | Melissa Maietta | MA Superior (Cambridge) | 6/01 |
| Kevin Seaver | Kenneth Labo | MA Probate (Marlboro) | 7/01 |
| Daniel Lindley | Paul Paluzzi | MA Superior (Boston) | 9/01 |
| Paul Mitchell | William Binley | MA Superior (Dedham) | 10/01 |

| | | | |
|---|---|---|---|
| William Wheatley | Gilda DeMelo | MA Superior (Taunton) | 10/01 |
| Thomas Beliveau | Rico Autori | MA Superior (Newburyport) | 10/01 |
| William Thompson | Jose Monteiro | MA Superior (Cambridge) | 1/02 |
| Francis J. Lynch, III | Michael Rivard | MA Superior (Boston) | 1/02 |
| Paul Epstein | Joseph Mari | MA Superior (Boston) | 1/02 |
| Daniel Lindley | Paul Paluzzi | MA Superior (Boston) | 2/02 |
| Robert Gabler | Christopher Lever | MA Superior (Boston) | 2/02 |
| Kenneth Margolin | Joseph Rice | MA Superior (Boston) | 3/02 |
| John Spinale | George Millette | MA Probate (Brockton) | 3/02 |
| Peter Antell | Kim Gordon | MA Superior (Boston) | 5/02 |
| Peter Eleey | Mary Cooper | MA Superior (Boston) | 8/02 |
| Mark Dolan | Judith Oliveira | RI Superior (Providence) | 8/02 |
| David Ward | John Grondalski | Federal (Boston) | 8/02 |
| Kimberly Winter | Nicholas Vanelli | MA Superior (Plymouth) | 9/02 |
| Steven Ferrarone | Joseph Weiss | MA Superior (Cambridge) | 10/02 |
| Jennifer Rosen | Michael Morin | MA Superior (Pittsfield) | 10/02 |
| Michael Heineman | Joseph Moutinho | MA Superior (Worcester) | 10/02 |
| Henry Owens | Joseph Simon | MA Superior (Cambridge) | 1/03 |
| Chris O'Connor | Katherine Marek | MA Superior (Fall River) | 1/03 |
| Geoffrey Domenico | Dominic La Greca | MA Superior (Brockton) | 2/03 |
| Paul Leavis | Mark Stymest | MA Superior (Lowell) | 3/03 |
| Kevin Phelan | Rebekha Abreu | Federal (Boston) | 3/03 |
| Steven Coren | Kelly Shanahan | MA Superior (Dedham) | 3/03 |
| Leonard Simon | Kelly Sipe | MA Superior (Boston) | 4/03 |
| Frederic Halstrom | Magan Sliney | Federal (Boston) | 5/03 |
| Marie Mercier | Samuel Natowicz | MA Superior (Cambridge) | 5/03 |
| Kevin Peters | Benjamin Schwartz | Federal (Boston) | 6/03 |
| Richard Brody | Odin Anderson | MA Superior (Cambridge) | 6/03 |
| Andrew Fischer | Curtis Evans | MA Superior (Boston) | 9/03 |
| Larri Parker | Mark Davio | MA Superior (Worcester) | 9/03 |
| David Dwork | John Stevenson | MA Superior (Cambridge) | 10/03 |
| Charles Capace | Zewdew Lakew | MA Superior (Cambridge) | 12/03 |

**Dana C. Hewins, Ph.D.**
*Economic Consultant*
1 Tamett Brook Road
Lakeville, Massachusetts 02347
508-946-1116   Fax: 508-947-5151

# AN EVALUATION OF THE PROBABLE NET LOST EARNINGS OF JOSE L. DACOSTA, JR.

Report prepared
for
J. Renn Olenn, Esquire

December 6, 2004

Page 2

In response to your request, I have evaluated the probable net loss of future earnings which resulted from the death of Jose L. DaCosta, Jr., on September 8, 2003. My analysis employed the standard methodology used by economists to determine the present values of future economic losses, and was based on data from both private and public sources, including the vocational assessment recently prepared by Amy Vercillo of Rehabilitation and Re-Employment, Inc.

## BACKGROUND

Jose DaCosta was born on August 23, 1978, and attended school to the tenth grade. He had worked primarily as a transit fisherman in the years preceding his death. Mr. DaCosta is survived by his common-law wife, Cathy Coe, who was born on November 22, 1975; his son, Tyler DaCosta, who was born on March 12, 1998; and his son, Matthew DaCosta, who was born on December 12, 2003.

## METHODOLOGY

In order to determine the net lost future earnings of Jose L. DaCosta, Jr., it was necessary first to calculate the present value of the earnings he would probably have earned, had he lived, and then subtract the amount of income which would have been spent exclusively on his own personal consumption. This difference between his lost future earnings and his own personal consumption expenditures is the proper measure of the present value of the net economic loss to his survivors.

Expressed simply, the present value of this net economic loss is equal to the lump-sum amount one would need to invest, at an appropriate interest rate, in order exactly to replace, on a year-by-year basis, the monetary benefits which have been lost by his survivors. Mathematically speaking, the present value of this net economic loss was calculated by "discounting" all relevant dollar amounts by the appropriate interest rate. For purposes of this analysis, all projected earnings totals were reduced to present value by using a *taxable* discount rate of 2.5 percent, a rate approximately equal to the average annual "real" (i.e., inflation-adjusted) yield on three-year government securities for the past 30 years.

Page 3

Using a real discount rate in tandem with real earnings growth rates eliminates the need to forecast inflation rates and is the standard methodology employed by economists to determine the present values of future economic losses. Please note also that the 2.5 percent real discount rate used here is well within the 1 to 3 percent range which the U.S. Supreme Court found to be reasonable in *Jones & Laughlin Steel Corporation v. Pfeiffer*, 103 S.Ct. 2541 (1983).

## DATA AND ASSUMPTIONS

In addition to the 2.5 percent real discount rate, the evaluation of Mr. DaCosta's lost future earnings required assumptions regarding worklife expectancy, earnings, and earnings growth rates.

**Worklife Expectancy** - In its 1986 publication entitled, *Worklife Estimates: Effects of Race and Education*, the U.S. Department of Labor (DOL) published worklife expectancy estimates for American workers, estimates which explicitly allowed for events such as premature death, disability, and voluntary early retirement. These worklife expectancy estimates were based on labor force data for 1979 and 1980, however, and are now widely regarded as outdated.

Utilizing exactly the same methodology employed by the DOL to compute worklife expectancies, but using more recent (1996-98) labor force data, Richards and Abele have calculated that the worklife expectancy of a currently-active white male, aged 25 years (Mr. DaCosta's age at the time of his death), who completed less than 12 years of education is 29.1 years (Richards and Abele, 1999, p. 172).

**Earnings** - In her aforementioned vocational assessment, Amy Vercillo has concluded that Jose DaCosta could not have sustained a physically-demanding career as a commercial fisherman because of his previous injuries and the early onset of osteoarthritis. Instead, Ms. Vercillo has opined that, because of his physical limitations and lack of transferable skills, Mr. DaCosta's best-case scenario would have been to earn an amount comparable to the earnings for men of his age and education, or $16,128 when measured in 2002 dollars. To allow for

wage increases which occurred between 2002 and 2003, this total was rounded upward to $17,000.

Furthermore, because personal consumption expenditures are based on family income, please note that Cathy Coe's earnings in 2003 equaled approximately $13,000 according to tax records.

**Earnings Growth Rates** - Jose DaCosta was 25 years old at the time of his death in 2003. Projecting the earning capacity of someone this young requires explicit recognition of the dynamics of wage increases. To explain, earnings tend to increase relatively rapidly in the early years of one's career as a result of experience, seniority, promotions, merit increases, job changes, and so forth, and then more gradually in the latter stages. These life-cycle earnings increases are clearly evidenced by many different sources, including the March supplements to the U.S. Department of Commerce's *Current Population Survey (CPS)*.

In addition to these life-cycle effects, the overall level of earnings for workers as a whole tends to rise over time as the productivity of the labor force in general increases. Finally, the overall level of earnings for workers as a whole tends also to increase over time to compensate for inflation.

As noted earlier, this entire analysis was done in real (i.e., inflation-adjusted) terms, so only the life-cycle and productivity factors were utilized here. Life-cycle effects were determined on the basis of an analysis of the *CPS* earnings data. Long-term productivity data were obtained from the most recent *Economic Report of the President*.

For purposes of this analysis, two different real earnings growth rates were employed, growth rates which combined both life-cycle and productivity effects in a manner which mirrored the lifetime earnings pattern of the typical male who has not completed high school. More specifically, it was assumed here that Mr. DaCosta's earnings would have increased in the future, had he lived, at the average annual real rate of 2 percent until age 45, and by 1 percent thereafter. These

growth rates were selected after an analysis of historical age-specific earnings data for men with 9 to 12 years of education (no diploma) as compiled by the U.S. Department of Commerce in its aforementioned *CPS* (March annual supplements).

## ECONOMIC ANALYSIS

The lost earnings of Jose DaCosta were projected from September 8, 2003, to the end of his 29.1-year statistically-expected worklife. It was assumed that Mr. DaCosta's base-year (2003) annual rate of pay of approximately $17,000, as gauged by Ms. Vercillo, would have increased over time at the real average annual rate of 2 percent until age 45, and by 1 percent thereafter. Given these parameters, and employing a real discount rate of 2.5 percent, the present value of Jose DaCosta's lost future earnings was determined to be $466,463 as of December 6, 2004, the date of this report.

As noted earlier, however, personal consumption expenditures which would have *exclusively* benefited the decedent must be subtracted from lost earnings in order to determine the net economic loss to a decedent's survivors. In this case, Mr. DaCosta's lost future income was reduced by 30 percent until his younger son, Matthew, reached age 18 in the year 2021, and by 40 percent thereafter.

These consumption percentages were chosen on the basis of a careful review of the personal consumption literature, especially those studies which have in various ways analyzed the data published by the U.S. Department of Labor in its on-going *Consumer Expenditure Survey* in order to determine the impact of sex, family size, and income level on personal consumption. Foremost among these studies of personal consumption have been a series of articles authored since 1991 by Robert Patton, David Nelson, and their associates (Ruble, et al., 2002). Applying these consumption percentages to Mr. DaCosta's projected earnings yielded present values for the probable lost earnings, net of personal consumption, equal to $310,319 as of December 6, 2004, the date of this report.

## OTHER ISSUES

Jose DaCosta was working as a commercial fisherman at the time of his death. Despite his osteoarthritis, he would probably have been able to continue working as a fisherman for a period of time following September 8, 2003, had he lived, although probably not for long in view of Ms. Vercillo's vocational assessment. Still, to the extent that he could have continued working as a commercial fisherman, he probably would have earned an income higher than the average for men of his age and education. This, in turn, implies that the evaluation performed here probably *understates* the economic loss to his survivors.

A second consideration, however, works in the opposite direction. More specifically, the evaluation of economic loss performed here assumed that Mr. DaCosta would have had an average worklife expectancy, had he lived. Because of his early-onset osteoarthritis, however, this is almost certainly too optimistic.

Numerous studies have documented the vocationally disabling effects of arthritis. For example, in a paper presented at the 75th Annual Conference of the Western Economic Association in July 2000, John McNeil of the U.S. Department of Commerce presented data showing that the employment rate for adults aged 21 to 64 years who have arthritis or rheumatism was only 47.4 percent in 1997. In comparison, the employment rate for nondisabled persons was 78.2 percent.

Several recent studies published in the *Journal of Rheumatology* have also underscored the negative impact of arthritis on employment rates. In 1998, W.F. Hawley reported that based on his longitudinal study of 823 patients, 25 percent had stopped working 6.4 years after the onset of arthritis, while 50 percent had become "work disabled" within 20.9 years of disease onset. In 1999, T. Sokka, et al., found that 44 percent of the 82 patients they had followed were unable to work as a result of arthritis within 10 years of onset. Finally, in an article published in 2000, E. M. Barrett, et al., found that 39 percent of the 160 patients in their study group were unable to work within 10 years of the onset of arthritis.

Page 7

In view of data such as these, it is highly probable that Jose DaCosta's ability to work in the future, in any capacity, would probably have been seriously adversely affected by his arthritis, had he lived. This, in turn, implies that the evaluation performed here probably *overstates* the economic loss to his survivors.

It is not possible to predict which of these two offsetting considerations would have been dominant. All things considered, however, the evaluation performed here -- which assumed earnings equal to the average for men of Mr. DaCosta's age and education, and a normal worklife expectancy -- probably represents, on balance, a reasonable estimate of the economic loss to his survivors.

## CONCLUSIONS

This report has summarized the results of research undertaken to evaluate the probable net loss of future earnings which resulted from the death of Jose L. DaCosta on September 8, 2003. Given the data, assumptions, and methodology presented earlier in this report, the present value of Jose DaCosta's probable lost earnings, net of his own personal consumption, was determined to equal $310,319 as of December 6, 2004, the date of this report.

Please be advised also that these results may be revised if and when additional information becomes available. If I can be of any further service to you in this matter, please do not hesitate to contact me.

Sincerely yours,

*Dana Hewins*

Dana C. Hewins, Ph.D.

Page 8

## Selected References

Barrett, E.M., et al., "The Impact of Rheumatoid Arthritis in the Early Years of the Disease," *Journal of Rheumatology*, December 2000, pp. 1403-09

Hawley, Wolfe, "The Longterm Outcomes of Rheumatoid Arthritis; Work Disability; A Prospective 18-year Study of 823 Patients," *Journal of Rheumatology*, November 1998, pp. 2108-17

Jacobs, Eva E., ed., *Handbook of U.S. Labor Statistics*, seventh edition, Lanham, MD: Bernan Press, 2004

McConnell, Campbell, et al., *Contemporary Labor Economics*, sixth edition, New York: McGraw-Hill, 2003

President's Council of Economic Advisers, *Economic Report of the President, 2004*, U.S. Government Printing Office, 2004

Richards, Hugh and Jon Abele, *Life and Worklife Expectancies*, Tuscon, Arizona: Lawyers and Judges Publishing Co., 2003.

Ruble, Michael R., Robert T. Patton, and David L. Nelson, "Patton-Nelson Personal Consumption Tables, 2000-01: Updated and Revised," *Journal of Forensic Economics*, Fall 2002, pp. 295-301.

Sokka, T., et al., "Work Disability in Rheumatoid Arthritis 10 Years After the Diagnosis," *Journal of Rheumatology*, August 1999, pp. 1681-5

U.S. Department of Commerce, *Statistical Abstract of the United States, 2003*, U.S. Government Printing Office, 2003

U.S. Department of Labor, *Consumer Expenditure Survey,* various issues, U.S. Government Printing Office

**Dana C. Hewins, Ph.D.**
*Economic Consultant*
1 Tamett Brook Road
Lakeville, Massachusetts 02347
508-946-1116   Fax: 508-947-5151

## QUALIFICATIONS

Dr. Dana C. Hewins is an economist who has had more than thirty years of academic and consulting experience. Educated in economics at Tufts University (Bachelor of Arts), the University of Chicago (CIC Traveling Scholar), the University of Illinois (Master of Arts, Doctor of Philosophy in Economics), and Harvard University (postdoctoral study), Dr. Hewins specializes in the areas of labor economics, health care economics, and forensic economics.

Dr. Hewins taught at Ohio University from 1973 to 1982. In 1981, he was named University Professor by Ohio University, the highest honor bestowed by that university for excellence in teaching. After serving as a visiting professor at Tufts University in 1983, he joined the staff of Regis College where he served as Chairman of the Department of Economics for many years prior to his decision to opt for early retirement in the Spring of 2002.

Since 1983, Dr. Hewins has provided economic analyses in a wide variety of legal proceedings. These proceedings have included personal injury, wrongful death, wrongful termination, lost profits, malpractice, divorce, discrimination, and antitrust actions. He has served both plaintiffs and defendants, and has testified in state and federal courts throughout Massachusetts.

Dr. Hewins has also served as an economic consultant to many organizations and institutions, including the Ohio Supreme Court, the Appalachian Regional Commission, and the Area Six Health Systems Agency. His research on a variety of topics has been published in periodicals such as the *American Bar Association Journal, Economic Inquiry, the Review of Social Economy, the I.C.C. Practitioner's Journal,* the *Quarterly Review of Economics and Business,* and the *Massachusetts Lawyer's Weekly*. He is a Director and past Chairman of the Board of the Bridgewater Savings Bank, and a member of the American Economic Association, the American Academy of Economic and Financial Experts, and the National Association of Forensic Economics.