OCT 28,2005 15:52                    000-000-00000                                    page 1

10/28/2005    15:25    GLENN & PENZA → 18313026008                              NO.839   P02

MKD:kap 37166  \pleading\37.66AffidavitAmyVercillo.wpd

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| CAROLINE DACOSTA, as Personal Representative and Administratrix for the Estate of JOSE L. DACOSTA, JR. : | |
| VS. : | C.A. NO  04CV12059 JLT |
| CPR FISHING, INC. : | |
| | |
| PEARL BEAUVAIS, as Personal Representative and Administratrix for the Estate of JOHN BEAUVAIS : | |
| VS. : | C.A. NO. 04-12057 NG |
| CPR FISHING, INC. : | |

### AFFIDAVIT OF AMY E. VERCILLO, M.S., C.R.C., C.D.M.S., L.R.C.

I, Amy E. Vercillo, under the pains and penalties of perjury, hereby make affidavit as follows:

1. I have been retained as a vocational rehabilitation expert by the defendants in the above entitled action. My findings are substantially contained in the attached report.

2. My qualifications as an educational and vocational rehabilitation expert are reflected in my curriculum vitae attached.

3. I will testify as to the educational and vocational assessment of the decedent in the above entitled action, in accordance with my report based on the following:

   A. Correspondence from the Law Offices of Thomas Hunt and Associates dated 4/27/04, 5/5/04, and 5/8/04

   B. A letter from the U. S. Department of Commerce, National Marine Fisheries Services - Permit Operations, of 7/14/04

   C. Correspondence dated 7/19/04 from the Law Offices of Thomas Hunt and Associates.

   D. A medical report from the Greater New Bedford Community Health Center Inc. dated 3/16/99.

-1-

E. Standard vocational reference material including the <u>Dictionary of Occupational Title</u>, <u>Guide to Occupational Exploration</u>, U.S. Department of Labor, and Massachusetts Department of Employment and Training Labor Market statistics.

4. Based on the medical history of the decedent from the Greater New Bedford Community Health Center, Mr. DaCosta had a ten (10) year history of back pain. As of 3/24/99, Mr. DaCosta was experiencing difficulty in heavy lifting, constant bending, and lifting of his position due to back pain. Based on the Community Health Center notes, the prior medical history included multiple injuries from dirt bike riding including numerous finger and hand fractures as well as neck and back injuries. The diagnosis was back pain secondary to osteoarthritis related to the multiple injuries from a dirt bike, aggravated by his job which required heavy lifting and constant stooping.

5. Mr. DaCosta's educational and vocational assessment reflects that he left high school in the tenth grade. His only past work history was listed as a "scalloper". Based on the definition of the scalloper in the <u>Dictionary of Occupational Titles</u> by the U.S. Department of Labor, the strength necessary to perform as a scalloper is categorized as heavy, meaning it requires an exertion of force of 50-100 lbs. occasionally or 25-50 lbs. frequently or 10-20 lbs. constantly.

6. Based on information from the <u>Occupational Outlook Handbook (2002-03)</u> the U. S. Department of Labor has stated, a) over 60% of the workers in the fishing and scalloping industry are self-employed; b) these occupations require strenuous work and long hours and provide only seasonal employment; c) employment is projected to decline, due to depletion of groundfish stocks and new federal and state laws restricting both commercial and recreational fishing.

7. Based on the information available regarding the fishing and scalloping industry, as well as the nature of the work as described in the above entitled publications, at the time of the accident, Mr. DaCosta was employed in heavy semi-skilled occupation. At the age of 21.5 years, based on his physical condition and educational experience, it is unlikely that Mr. DaCosta would have continued in the occupation of a fisherman/scalloper. The physical demands would likely be beyond his functional capacity on a prolonged basis.

8. Based on Mr. DaCosta's education and experience, Mr. DaCosta would likely be restricted to unskilled work. He would likely be restricted to light physical work involving exerting force no greater than 20 lbs., and sedentary occupations involving exertion or force no higher than 10 lbs.

9. Mr. DaCosta's residual earning capacity, in a best case scenario, would be equal to the median annual earnings for males in the general labor market. For males age 18 to 29, with less than a high school education, the mean annual earnings in 2002 were $16,128 per year. Mr. DaCosta was 24.9 years old at the time of his death, and would have a work life expectancy of 29.4 years (based on the U. S. Department of Labor publication 2254).

-2-

OCT 23 2005 15:33    000-000-00000    page 3

10-28-2005    13:14    GLENN & PENZA → 18313826008    NO.939    004

10. At 29.8 years, without consideration of wage increases or reduction to present value, Mr. DaCosta's lost earning potential would be $480,614.40 based on an earning capacity of $16,128 annually.

_____
AMY E. VERCILLO

STATE OF RHODE ISLAND

Subscribed and sworn to me this 28 day of October, 2005.

_____
Notary Public
My commission expires:  1-31-11


COMMONWEALTH OF MASSACHUSETTS
COUNTY OF Suffolk

On this 28 day of October, 2005, before me personally appeared Amy Vercillo to me known to be the person described in, and who executed the foregoing instrument, and he/she acknowledged that he/she executed the same.

_____
NOTARY PUBLIC
My commission expires: 1-31-11

-3-

## CERTIFICATION

I certify that I sent a true copy of the within on  *October 28, 2005*  to:

Thomas J. Hunt, Esq.
THOMAS J. HUNT AND ASSOCIATES
18 North Water Street
New Bedford, MA 02740

*Kindia Pascucci*

**R** Rehabilitation and  
**R** Re-Employment inc.

New England Regional Office

115 Cedar Street • Providence RI 02093-1035

(401)272-4552 • (401)331-4336 fax

1-800-294-5323

## PROFESSIONAL PROFILE

## AMY E. VERCILLO M.S., C.R.C., C.D.M.S., L.R.C.

### EDUCATION AND CERTIFICATIONS

1994    Vocational Expert, Social Security Office of Hearings and Appeals  
1993    ScD. Candidate, Rehabilitation, ABD, Boston University  
1991    Licensed Rehabilitation Counselor (L.R.C.)  
1986    Certified, U.S. Department of Labor, Workers' Compensation  
1985    Certified Disability Management Specialist (C.D.M.S.)  
1984    Certified Rehabilitation Counselor (C.R.C.)  
1984    M.S., Rehabilitation Counseling, Boston University  
1983    B.S., Rehabilitation Services, Boston University

### GOVERNMENT APPOINTMENTS

1988    Selected by USDOL for Pilot Rehabilitation Study

1990- Governor's Advisory Council on Workers' Compensation  
1997    Appointed to a five year position as the Rehabilitation Representative on the 14 member Advisory Council. Responsibilities include: oversight of the MA Dept. of Industrial Accidents, review of judicial nominations, review and approval of 16 million dollar operating budget, review and report on all legislation regarding Workers' Compensation, review and analysis of insurance rate filings, develop and procure research studies on Workers' Compensation System and report to MA legislature.

### TRAINING PUBLICATIONS AND SEMINARS

1983    Placement of the Ex-Offender Department of Corrections, Boston, MA  
1987    Publication: Re-employment of the Head Injured Client, HEADLINES  
1989    Speaker: MA Head Injury: "Insurance and Head Injury Rehabilitation"  
1990    Speaker: Whittier Rehab. Hospital: "Vocational Rehabilitation Implications in the Workers' Compensation System"  
1990    Speaker: New Medico Head Injury System: "Brain Injury and the Compensation Carrier; Realistic Expectations for Difficult Cases"  
1990    Speaker: New Medico Head Injury System: "Marketing to Referral Sources"  
1991    Speaker: PRO-MASS: "Employment Services and ADA"  
1991    Speaker: MA Head Injury: "Private Health Care Policy Coverage"  
1992    Speaker: MA Risk and Insurance Management Society: "ADA and Workers' Compensation Carrier"  
1993    Speaker: Boston University: "National Health Care Reform and Workers' Compensation"  
1994    Speaker: MA Rehabilitation Commission: "Ethical Issues in Rehabilitation"  
1994    Speaker: MA Academy of Trial Lawyers: "Use of the Vocational Expert"

PROFESSIONAL EXPERIENCE

| | | |
|---|---|---|
| 1986-<br>Present | Rehabilitation and Re-Employment, Inc.<br>Manager of Private Rehabilitation Agency.<br>Supervised a staff of Rehabilitation Nurses, Vocational Counselors, Employment<br>Specialists, Marketing Representative and Clerical Staff. | Boston, MA/ Providence RI |
| 1983-<br>1985 | IMARC/Crawford Risk Management<br>Vocational Rehabilitation Counselor for disabled clients receiving Workers'<br>Compensation | Braintree, MA |
| 1982- | Boston Employment Resource Center<br>Vocational Rehabilitation Counselor for special needs parolees | Boston, MA |

1987-  CLINICAL AGENCY SUPERVISOR
1996        Provided clinical supervision to graduate Rehabilitation Counseling students at Boston
            University

1993-    ADJUNCT INSTRUCTOR
Present     Instructor in the Rehabilitation Counseling Department at Boston University for
            undergraduates and graduate students

PROFESSIONAL AFFILIATIONS

1987 to  National Association of Rehabilitation Providers in the Private Sector
Present      NE Legislative Chair, 1987-1989, 1994-1996 ,MA Regulatory Chair, 1987-1989

1994 to  National Association of Rehabilitation Educators
Present

1990-93 Rehabilitation Professionals of Massachusetts, Co-Chairperson

EXPERT TESTIMONY

Qualified as a Vocational Rehabilitation Expert in MA District and Superior Courts,
US Federal Court, Social Security and MA Department of Industrial Accidents

**R** **Rehabilitation and**
**R** **Re-Employment** inc.
New England Regional Office

115 Cedar Street • Providence RI 02093-1035

(401)272-4552  •  (401)331-4336 fax
1-800-294-5323

October 4, 2004

Attorney J. Renn Olenn
Olenn & Penza
530 Greenwich Ave
Warwick RI 02886

**RE:**          **CLIENT:** DECOSTA, Jose

### VOCATIONAL ASSESSMENT

**BACKGROUND:** Jose DeCosta was working as a scalloper on the fishing boat Lonely Hunter at the time of his death on 9/8/03. At the time of his death he was 24.9 years old (DOB 8/23/78). This file was referred to Rehabilitation and Re-Employment for a Vocational Assessment to evaluate Mr. DeCosta's earning capacity and work life expectancy if not for his demise.

My opinions herein are in part based upon a review of the following information and documents:

1. Letter dated 4/27/04 from the Law Offices of Thomas Hunt & Associates;

2. Letter dated 5/5/04 from the Law Offices of Thomas Hunt & Associates;

3. Letter dated 5/8/04 from the Law Offices of Thomas Hunt & Associates;

4. Letter dated 7/14/04 from the US Dept. of Commerce, National Marine Fisheries Services-Permit Operations;

5. Letter dated 7/19/04 from the Law Offices of Thomas Hunt & Associates;

6. Medical Report from Greater New Bedford Community Health Center Inc. dated March 24, 1999;

7. The use of standard vocational reference material including: the *Dictionary of Occupational Titles*, *Guide to Occupational Exploration*, U.S. Department of

Labor, and Massachusetts Department of Employment and Training Labor Market Statistics.

**MEDICAL HISTORY:** A History and Physical Examination dated 3/24/99 from the Greater New Bedford Community Health Center notes that Mr. DeCosta has a ten year history of back pain and as of that date was experiencing difficulty in completing the heavy lifting, constant bending and lifting of his position. The prior medical history includes multiple injuries while dirt biking including numerous finger and hand fractures, neck and back injuries. The diagnosis was back pain secondary to osteoarthritis related to the multiple injuries which has been aggravated by his job which requires heavy lifting and constant stooping.

**EDUCATIONAL/VOCATIONAL ASSESSMENT:** Mr. DeCosta left school in the 10th grade and the only past work history listed is as a scalloper. According to the US Department of Labor, *Dictionary of Occupational Titles* the following is the occupational definition and physical demands of this occupation.

> **446.684-014  FISHER, SCALLOP (fishing & hunting)**
> Cultivates and harvests shellfish by performing any combination of following duties: Loads marking stakes on barge, and moves barge to shellfish bed. Drives stakes into mud in pattern using sledgehammer. Sows spat by scattering it within staked enclosure. Covers seeded area with mixture of sand and broken shells of shellfish onto which spat attaches, using shovel. Wades in shellfish bed and digs or rakes for shellfish, using rake, fork, and spade. Treads in water and feels for shellfish with bare feet, gathers shellfish, and drops them into container. Reaches from boat with rake-tongs and gropes for shellfish by moving handles to open and close tongs. Drags brail rod (pipe with series of hooks attached) behind powerboat to pull shellfish from mud. Rigs and lowers dredge into shellfish bed from mast and boom of powerboat, using block and tackle. Hoists dredge and pulls dump ring to empty catch. Picks out market-size shellfish from catch, and replants smaller ones. Packs and ices marketable shellfish in containers for shipment. Unloads loose shellfish from boat, using shovel.
> SPECIFIC VOCATIONAL PREPARATION:     SVP = 3
>    (Education, Training, and/or Experience) Semi-Skilled – Training 30 days to 3 months.
> STRENGTH: Heavy
> Exert force of 50-100 lbs. occasionally, or 25-50 lbs. frequently, or 10-20 lbs. constantly.
>
> ADDITIONAL INFORMATION -DATA SOURCE: U.S. Dept. of Labor - Occupational Outlook Handbook [2002-2003] Page: 428

- Over 60 percent of the workers are self-employed, among the highest proportion in the workforce.
- Many jobs require strenuous work and long hours, and provide only seasonal employment.
- Employment is projected to decline, due to depletion of fish stocks and new Federal and State laws restricting both commercial and recreational fishing.

Nature of Work

Fishers and fishing vessel operators catch and trap various types of marine life for human consumption, animal feed, bait, and other uses. Fishing hundreds of miles from shore with commercial fishing vessels-large boats capable of hauling a catch of tens of thousands of pounds of fish-requires a crew including a captain, or skipper, a first mate and sometimes a second mate, and deckhands with specialized skills.

The fishing boat captain plans and oversees the fishing operation-the fish to be sought, the location of the best fishing grounds, the method of capture, the duration of the trip, and the sale of the catch. The captain ensures the fishing vessel is seaworthy; oversees the purchase of supplies, gear, and equipment such as fuel, netting, and cables; obtains the required fishing permits and licenses; and hires qualified crew members and assigns their duties. Upon returning to port, the captain arranges for the sale of the catch-directly to buyers or through a fish auction-and ensures that each crew member receives the prearranged portion of adjusted net proceeds from the sale of the catch. The first mate-the captain's assistant, who must be familiar with navigation requirements and the operation of all electronic equipment-assumes control of the vessel when the captain is off duty. Duty shifts, called watches, usually last 6 hours. The mate's regular duty, with the help of the boatswain and under the captain's oversight, is to direct the fishing operations and sailing responsibilities of the deckhands. These include the operation, maintenance, and repair of the vessel, and the gathering, preservation, stowing, and unloading of the catch. The boatswain, a highly experienced deckhand with supervisory responsibilities, directs the deckhands as they carry out the sailing and fishing operations. Before departure, the boatswain directs the deckhands to load equipment and supplies, either by hand or with hoisting equipment, and to untie lines from other boats and the dock. When necessary, boatswains repair fishing gear, equipment, nets, and accessories. They operate the fishing gear, letting out and pulling in nets and lines. They then wash, salt, ice, and stow away the catch. Deckhands also must ensure that decks are clear and clean at all times and the vessel's

engines and equipment are kept in good working order. Upon return to port, they secure the vessel's lines to and from the docks and other vessels. Unless laborers or longshore workers are hired, the deckhands unload the catch.

Some full-time and many part-time fishers work on small boats in relatively shallow waters, often in sight of land. Navigation and communication needs are vital and constant for almost all types of boats. Crews are small-usually only one or two people collaborate on all aspects of the fishing operation. Dredges and scrapes are sometimes used to gather shellfish such as oysters and scallops. Fishers use a wide variety of hand-operated equipment-for example, nets, tongs, rakes, hoes, hooks, and shovels-to gather fish and shellfish. This industry had experienced significant growth in the 1970s and 1980s, but declined in the 1990s because of the limited availability of fish.

WAGE INFORMATION
The majority of fishers earn between $300 and $750 per week (U.S. Bureau of Labor Statistics, 2001). Earnings of fishers and fishing vessel operators normally are highest in the summer and fall-when demand for services peaks and environmental conditions are favorable-and lowest during the winter. Many full-time and most part-time workers supplement their income by working in other activities during the off-season. For example, fishers may work in seafood processing plants, establishments selling fishing and marine equipment, or in construction, or in a number of non-related, seasonal occupations.

Earnings of fishers vary widely, depending upon their position, ownership percentage of the vessel, size of ship, and the amount and value of the catch. The costs of the fishing operation-the physical aspects of operating the ship such as the fuel costs, repair and maintenance of gear and equipment, and the crew's supplies-are deducted from the sale of the catch. Net proceeds are distributed among the crew members in accordance with a prearranged percentage. Generally, the ship's owner-usually its captain-receives half of the net proceeds. From this, the owner pays for depreciation, maintenance and repair, replacement and insurance costs of the ship and equipment; the money remaining is the owner's profit.

**VOCATIONAL PROFILE:** At the time of the accident, Mr. DeCosta was employed in a Heavy, Semi-skilled occupation. This is an occupation which requires exerting force of 50-100 lbs, long hours, frequent bending, stooping, lifting, carrying, as well as exposure to extremes of temperature and humidity. In 1999,

at age 21.5 Mr. DeCosta had been diagnosed with back pain secondary to osteoarthritis related to the multiple injuries/fractures from dirt biking being aggravated by his heavy work as a scalloper. Vocationally, it is unlikely that Mr. DeCosta would have continued in this arduous occupation based on the fact that osteoarthritis is a degenerative joint disease and Mr. DeCosta was already symptomatic at such a young age. The physical demands of this occupation would likely be beyond his functional capacity on a prolonged basis.

Based on the fact that Mr. DeCosta's past work would not offer transferable skills Mr. DeCosta would be restricted to unskilled work. His medical impairments would prevent him from performing the physical demands of a scallop fisherman on a sustained basis and likely restrict him to light (exerting force of up to 20 lbs.) and sedentary (exerting force of up to 10 lbs.) occupations.

**LOST EARNING CAPACITY/WORK LIFE EXPECTANCY:** His residual earning capacity is a best case scenario would be the median annual earnings for males in the general labor marker. For white males age 18-29 with less than a high school education the mean annual earnings in 2002 (the most recent wage data by education) were $ 16,128 (www.census.gov/prod).

At the time of his demise in 2003 Mr. DeCosta was 24.9 years old with a work life expectancy of 29.8 years (USDOL publication 2254, work life expectancy for a white male with less than a high school education).

**SUMMARY:** Mr. DeCosta was 24.9 years old at the time of his death on 9/8/03. Assuming an earning capacity of $ 16,128 per year and a work life expectancy of 29.8 years and without consideration of wage increases or reduction to present value, his lost earning potential would be $ 480,614.40.

If you have any questions, or if I can provide you with any additional information, please feel free to contact me.

Respectfully submitted,

Amy E. Vercillo, C.R.C., C.D.M.S.
Vocational Counselor/Manager